# COVINGTON

BEIJING   BRUSSELS   DUBAI   JOHANNESBURG   LONDON
LOS ANGELES   NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

Covington & Burling LLP
One Front Street
San Francisco, CA 94111-5356
T +1 415 591 6000

**Via ECF**

September 11, 2017

The Honorable Joseph A. Dickson
United States District Court for the District of New Jersey
50 Walnut Street, 5th Floor
Newark, New Jersey 07101

**Re: Microsoft Corporation v. BioReference Laboratories, Inc.
Case No. 2:16-CV-02291-ES-JAD**

Dear Judge Dickson:

Plaintiff Microsoft Corporation writes regarding Defendant BioReference's attempts to shield potentially case-dispositive documents from discovery on the basis of untenable assertions of work product protection.[1] Resolution of this case is a matter of simple math: comparing how much software BioReference used, and how much software it paid for. By its work product claims, BioReference is obstructing Microsoft's access to information regarding its current and historical use of Microsoft software—discovery that is crucial to the calculation that lies at the heart of this case.

The central dispute here concerns BioReference's unlicensed use—*i.e.*, piracy—of Microsoft software, in breach of the terms of the licensing agreements entered into by the parties and in violation of federal copyright laws. A software licensing audit conducted by KPMG beginning in December 2014 revealed that BioReference had used millions of dollars' worth of Microsoft software without paying for it. While BioReference has admitted to and paid for $1.4 million in underlicensing, it has resisted paying the approximately $2 million still outstanding. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ *See* Ex. B (emails produced by BioReference as BRL-0005426-27). If the documents produced by BioReference demonstrate

---

[1] *See* Ex. A ("First Privileged Document Log"), Entry Nos. 10-19; 36; 40-44; 53; 58; 67-68; 70-71; 73-75; 86-90; 115; 118-119; 121-25; 132-37; 141-42; 144; 151; 153-54; 173; 186; 188-89; 204-05; 207-12; 217; 220; 222-23; 233; 240-41; 247-48; 252-54; 256; 263-64; 266; 268-70; 273-77; 281-83; 291-93; 297-98; 309-11; 314; 318; 320-21; 324; 327; 329-31; 334-35; 342-43; 352; 354; 357; 365; 367-69; 371-73; 376-80; 382-85; 387-88; 396; 398-400; 408-410; 425-26; 428-29; 432-33; 435; 440-41; 443-44; 450-52; 458; 466; 471; 473; 476; 481; 483; 498; 501; 507-12; 517-18; and 521-25.

**COVINGTON**

The Honorable Joseph A. Dickson
September 11, 2017
Page 2

this level of deceit, one can only imagine what the documents BioReference deemed too hot to produce must contain.

Almost five months have elapsed since Microsoft first served discovery requests seeking information about BioReference's software usage, yet BioReference continues to shield two key categories of evidence from Microsoft: (1) contemporaneous usage data, and (2) communications with a software consultant hired by BioReference to provide technical advice regarding its licensing position. These tactics continue BioReference's pattern of obstruction throughout the contractual audit process, during which it blocked KPMG's efforts to collect data regarding BioReference's use of Microsoft software that was necessary to complete the audit.

The present discovery dispute concerns BioReference's attempt to shield highly relevant communications about BioReference's software use by asserting specious claims of work product protection. But BioReference never anticipated litigation when the documents were prepared—its entire strategy was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. B. Furthermore, the communications at issue are not "trial preparation materials" involving lawyers; rather, they are internal emails between non-lawyer BioReference employees, or emails between non-lawyer BioReference employees and Software Licensing Advisors ("SLA"), the software consultant hired by BioReference. Most of these emails were exchanged long before this litigation was filed, and there is no indication that any of the shielded documents were created because of any reasonably anticipated litigation. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Separately, SLA—who is represented in this litigation by the same lawyers as BioReference—objected on work product grounds to the bulk of Microsoft's subpoena for deposition testimony and production of documents, which seeks highly relevant information regarding SLA's consulting work in connection with the contractual audit. SLA has produced no documents at all. *See* Ex. C.

BioReference's work product claim is truly remarkable—it is asserting that it can hide direct evidence of misconduct in connection with the very audit that is the center of this case, merely because that audit identified underlicensing and ultimately led to litigation. That position is untenable. This Court, with or without an *in camera* review of the withheld documents, should reject BioReference's privilege assertions and order it to produce the documents.

**I.   Legal Standard**

Under a protection applicable to "Trial Preparation[] Materials," Federal Rule of Civil Procedure 26(b)(3)(A) provides that parties ordinarily "may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." As the comments note, the focus of the provision is on documents that "lawyers have prepared or obtained . . . *for trial*." Fed. R. Civ. P. 26(b)(3) advisory committee's note to 1970 amendment (emphasis added). Although the rule can extend to documents prepared pre-litigation or by non-lawyers, it is plain that the purpose of the provision is, as the

COVINGTON

The Honorable Joseph A. Dickson
September 11, 2017
Page 3

title indicates, to shield "trial preparation[] materials." It would be bizarre if a party could shield evidence of its wrongdoing merely because it thought that its wrongdoing might result in litigation. Indeed, such a principle would result in shielding the most relevant possible documents.

The party asserting work product protection bears the burden of proving a document constitutes work product. *Torres v. Kuzniasz*, 936 F. Supp. 1201, 1208 (D.N.J. 1996). To carry that burden, the party must demonstrate the precise manner in which a document is protected; "blanket assertions of privilege will not suffice." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000).

To justify work product protection, courts in this Circuit first require the party asserting the protection to satisfy the "reasonable anticipation test," which asks whether "litigation could reasonably have been anticipated" at the time the document was created. *In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 183 (D.N.J. 2003) (citations omitted). Whether a particular document "was prepared in anticipation of litigation is often a difficult factual matter." *United States v. Rockwell Int'l,* 897 F.2d 1255, 1266 (3d Cir. 1990). But "a party must show more than a remote prospect, an inchoate possibility, or a likely chance of litigation"—to demonstrate that litigation was anticipated; "a party must show that there existed an identifiable specific claim of impending litigation when the materials were prepared." *In re Gabapentin*, 214 F.R.D. at 183 (citations and internal quotation marks omitted). "The mere involvement of, consultation with, or investigation by an attorney does not, itself," suffice to create protectable work product. *Id.* And neither does the mere fact that litigation eventually arises transform everyday business documents into protectable work product. *Leonen v. Johns-Manville*, 135 F.R.D. 94, 97 (D.N.J. 1990). The contingency of litigation is not determinative, and "[e]ven after litigation is justifiably anticipated, routine or ordinary investigations or reports are not work-product." *Jones v. Nationwide Mut. Fire Ins. Co.*, No. 3:08-cv-2202, 2010 WL 181753, at *1 (M.D. Pa. Jan. 12, 2010).

In this Circuit, the inquiry does not stop even after a reasonable anticipation of litigation is established: the party seeking protection must then also establish that, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979) (emphasis added) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 2024, at 198 (1970)). Whether work product protection ultimately applies therefore "depends primarily on the reason or purpose for the documents' production," and "[d]ocuments created for other purposes that prove useful in subsequent litigation" are not work product. *In re Gabapentin*, 214 F.R.D. at 184. Only materials created "because of litigation and not for business or other reasons" can be withheld. *Am. Home Assurance Co. v. United States*, No. 09-cv-258 (DMC), 2009 WL 3245445, at *1 (D.N.J. Oct. 7, 2009). Thus, documents created in the normal course of business or merely "in connection with" a claim are not protected. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 139 (3d Cir. 2000). For example, materials produced by insurance companies in their inspection of claims, and materials created during investigations of workplace injuries in response to the risk of lawsuits are not protectable just because litigation subsequently arises— these are materials produced within the everyday functions of those businesses. *Jones*, 2010 WL 181753, at *3-4; *Prater v. Consol. Rail Corp.*, 272 F. Supp. 2d 706, 713 (N.D. Ohio 2003).

COVINGTON

The Honorable Joseph A. Dickson
September 11, 2017
Page 4

Even when the work product protection applies, it may be overcome if the party seeking the materials demonstrates a "substantial need" for the information and that the information cannot be obtained "without undue hardship." Fed. R. Civ. P. Rule 26(b)(3)(A)(ii). Courts within this Circuit freely engage in *in camera* reviews of challenged documents to determine whether work-product protection applies. *See, e.g., Liberty Int'l Underwriters Canada v. Scottsdale Ins. Co.*, No 12-4934 (NLH/JS), 2015 WL 9480014, at *2 (D.N.J. Dec. 29, 2015).

## II. Background

### A. Contractual Software Use Audit

Microsoft and BioReference were parties to a series of volume licensing agreements ("License Agreements") that permitted BioReference to use and copy Microsoft software if it timely obtained and paid for licenses to that software. To ensure that BioReference did not abuse this system, the License Agreements gave Microsoft the right to audit BioReference's use of Microsoft software at any time, and for any reason, to verify its compliance with the terms of the agreements. *See* Dkt. No. 15, Ex. A § 7(b).

Software audits under the terms of the License Agreements are not legal proceedings. Rather, an audit is a contractual mechanism that permits Microsoft to ensure licensees comply with their terms of use *without* resort to litigation. An audit is part of the business process; fundamentally, it carries business, not legal, implications.

In December 2014, Microsoft exercised its contractual right and retained KPMG to conduct an audit of BioReference's Microsoft software use. BioReference refused to cooperate with the contractually-required audit and obstructed KPMG's attempts to gather usage data, including blocking KPMG from conducting the crucial on-site portion of the audit. Based on the limited usage data that was made available, KPMG's audit revealed that BioReference had copied and used millions of dollars' worth of Microsoft software products without timely ordering or paying for the required licenses.

In connection with the software audit and the ensuing business negotiations between the parties, BioReference hired Software Licensing Advisors ("SLA") in or around May 2015. SLA is a company that specializes in "Audit Protection and Defense" and claims to offer "assistance with any Microsoft compliance request before and throughout the audit process to understand how to control the conversation and set ground rules that ensure a fair and reasonable Microsoft audit interaction."[2] SLA is not a law firm—it is a software consultancy that shepherds companies through Microsoft licensing audits. ████████████████████████████████████████████████████████████████████████████

---

[2] *See* Software Licensing Advisors: The Customer Advocate for Microsoft Licensing, http://www.msftadvisors.com/services/protect/auditprotectionanddefense (last visited Aug. 30, 2017).

**COVINGTON**

The Honorable Joseph A. Dickson
September 11, 2017
Page 5

After over a year of negotiations and attempts to enforce the terms of the License Agreements without resorting to litigation, it became evident that BioReference had no intention of remedying its licensing shortfall. ▮ Microsoft was thus forced to file this action on April 22, 2016.

### B. Present Discovery Dispute

After several months of silence in response to Microsoft's repeated request for information regarding BioReference's current and historical use of Microsoft software, BioReference's communications with SLA about the contractual audit, and SLA's work papers—all discoverable information that bears directly on the core issue of BioReference's Microsoft licensing position—BioReference served its First Privileged Document Log on August 8, 2017. *See* Ex. A. The log contains over 150 entries concerning roughly 200 emails and other documents that BioReference is withholding solely on work product grounds. Even a cursory review of the descriptions BioReference provides in support of its claims for work product protection makes plain that its assertions are unsupported because the withheld documents were prepared during the normal course of business.

In its privilege log, BioReference consistently relies on the talismanic recitation of ▮ to fabricate work product protection over business communications regarding BioReference's software use and licensing position that go to the core of this dispute. That is untenable. ▮ Thus, BioReference's own documents confirm that it *never* anticipated litigation and formulated a strategy to withhold payment for exactly that reason. It cannot now reverse course and claim a work product protection that depends on a reasonable anticipation of litigation.

Furthermore, BioReference's privilege log on its face fails to establish any predicate for work product protection. Just a few examples suffice to demonstrate the specious nature of BioReference's work product protection claims:

- ▮

- ▮

**COVINGTON**

The Honorable Joseph A. Dickson
September 11, 2017
Page 6



*See, e.g.*, Ex. A, Entry Nos. 36, 40, 173, 204, 208, 321. No suit was pending or anticipated during the time period this log covers; as many of the entries demonstrate on their face, many of these communications were prepared in connection with *business* negotiations arising from the contractual audit process. Moreover, there is no indication from the document descriptions that any lawyers were involved in the creation of this supposed work product.

---

[3] SHI is a third-party Microsoft reseller that processed BioReference's license orders.

COVINGTON

The Honorable Joseph A. Dickson
September 11, 2017
Page 7

Microsoft separately served a Subpoena to Testify at a Deposition in a Civil Action ("Subpoena") on SLA, who is represented in this action by the same counsel as BioReference. The Subpoena requested SLA to produce documents related to its work for BioReference in connection with the Microsoft licensing audit, such as any agreements with BioReference, documents relating to compensation and retention by BioReference for the audit, communications between BioReference and SLA about BioReference's current and historical use of Microsoft software, and documents relating to SLA's attempts to measure that software use. Microsoft also requested SLA to produce a witness for deposition on similar topics. SLA objected to the Subpoena in its entirety, refusing to produce any documents or a witness for deposition on the ground that Microsoft's requests sought discovery "protected by the attorney-client privilege or work product." Ex. C. SLA did not provide any justification for its work product claim.

### III.     Argument

#### A.     BioReference's Work Product Protection Claims Are Unfounded.

##### 1.     Documents created in response to the audit and ensuing negotiations were created for business reasons, not for purposes of litigation.

On their face, the descriptions in BioReference's privilege log reveal that the shielded "work product" documents were not prepared because of reasonably anticipated litigation but instead in connection with BioReference's business negotiations with Microsoft arising out of the contractual software use audit. When it voluntarily entered into the License Agreements, BioReference agreed to permit Microsoft to audit its software use at any time, and for any reason. *See* Dkt. No. 15, Ex. A § 7(b). Work related to the audit was not litigation preparation subject to work product protection, it was business activity contemplated by the License Agreements. Courts routinely hold that internal audits and investigations, even though they may relate to topics that become the subject of subsequent litigation, are not protected. *See, e.g., Seibu Corp. v. KPMG LLP*, No. 3:00-cv-1639-X, 2002 WL 87461, at *4 (N.D. Tex. Jan. 18, 2002) (audit report not protected where "primary purpose of the internal investigation was to make personnel decisions regarding the termination of partners"). ████████████████
████████████████████████████

Tellingly, a number of entries assert the inconsistent position that a communication was prepared *both* in connection with business negotiations to resolve the deficiencies identified in the contractual licensing audit *and* in connection with litigation that was not filed until several months later. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

COVINGTON

The Honorable Joseph A. Dickson
September 11, 2017
Page 8

[REDACTED]

      Contemporaneous correspondence between the parties confirms that the audit negotiations were not in preparation for litigation, but instead in furtherance of reaching a business resolution to the licensing dispute.  In a letter dated November 19, 2015, BioReference's outside counsel emphasized BioReference's goal of "negotiat[ing] a commercial resolution."  Ex. E.  Moreover, Microsoft rejected BioReference's proposal to "continu[e] [the parties'] discussions under FRE 408," *id.*, evidencing that litigation was not reasonably anticipated.

      Indeed, the business negotiations and related communications that followed KPMG's audit were undertaken to *avoid* litigation, and "[a] process designed to avoid litigation can hardly be said to be one in anticipation of litigation."  *Wash. Metro. Area Transit Auth. v. One Parcel of Land in Prince George's Cty., Md.*, 342 F. Supp. 2d 378, 381 (D. Md. 2004).  These business documents are not transformed into work product just because this lawsuit was eventually filed.  *Leonen*, 135 F.R.D. at 97 ("[T]he mere fact that litigation does eventually occur, does not by itself bring documents within the ambit of the work-product doctrine.").  As the Seventh Circuit has held, memoranda prepared by counsel regarding a breach of contract dispute are not work product if the parties, while corresponding in a "threatening" tone, are still attempting to resolve their differences.  *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1120-21 (7th Cir. 1983).

      BioReference's goal in retaining SLA to assist in its response to the KPMG audit was to refute KPMG's findings and negotiate a lower payment amount to cure its severe licensing shortfall.  Its actions here were those of a negotiating party, not one preparing for litigation. [REDACTED] Ex. B.  As late as January 2016, BioReference continued to submit additional information to KPMG concerning BioReference's software usage.  These are not the actions of a party preparing for litigation but one attempting to fulfill its obligations under a contract and avoid litigation.  As a result, these communications are not subject to work product protection.

      **2.    Documents that were not produced by, or at the request of, attorneys, are not generally protectable work product.**

      BioReference's work product log entries also lack the telltale sign of work product—attorney involvement.  BioReference does not even purport to claim an attorney was involved in the creation of the vast majority of the documents withheld on the basis of work product protection; in fact, only a smattering of the over 150 entries reference attorneys at all.  That the log entries describe communications between non-attorney employees and outside software licensing advisors is further evidence that all of this information was prepared pursuant to ordinary business aims.  *See Garcia v. City of El Centro*, 214 F.R.D. 587, 593 (S.D. Cal. 2003) (lack of attorney involvement highly relevant when assessing whether an investigation is conducted "in the ordinary course of business" and thus not subject to work product protection).

COVINGTON

The Honorable Joseph A. Dickson
September 11, 2017
Page 9

      The mere fact that a few of the emails were sent in response to attorneys' questions does not change the overall analysis in the absence of any indication that they were prepared because of reasonably anticipated litigation.  *See In re Gabapentin*, 214 F.R.D. at 183 (noting that "[t]he mere involvement of, consultation with, or investigation by an attorney does not, itself," suffice to justify work product protection).

> 3.  **BioReference's vague and boilerplate privilege descriptions do not identify with specificity why each document is entitled to work product protection and require *in camera* review to properly assess.**

      Finally, BioReference has failed to carry its burden in demonstrating that its logged documents are properly withheld.  As noted above, BioReference's halfhearted attempt to carry its burden by repeating ███████████████ at the end of every description in its privilege log is unavailing, particularly when the remainder of the description evidences that the document was not prepared because of reasonably anticipated litigation.  In addition to descriptions of documents that are decidedly *not* work product, BioReference's privilege log is replete with insufficient vague and boilerplate descriptions of documents.  And some entries lack privilege descriptions entirely. ███████████████████████████████████████████████████████████████████████████████████████████████████████

      BioReference's descriptions facially fail to establish the basis for privilege. ████████████████████████████████████████████████████████████████████████████████ could hypothetically describe an email from BioReference's CIO to BioReference's CEO saying, "Wow, this audit is a problem.  They're on to us.  Microsoft will probably learn about our decision to steal $3.5 million in software.  We should try to negotiate our way out of this."  Such a communication would obviously not be protected from disclosure. ████████████████████████████████████████████████████████████████████████████ ould be BioReference's SLA contact emailing BioReference's IT director to say, "KPMG has it pretty much right.  But if you just keep obstructing the audit process, Microsoft will likely compromise on the audit value."  BioReference's descriptions of documents are consistent with the absence of privilege.  Microsoft therefore requests that this Court conduct an *in camera* inspection of the challenged privilege log entries to assess the validity of BioReference's claims of work product protection.

> 4.  **SLA's unsupported blanket objections to Microsoft's subpoena for deposition testimony and documents are similarly unfounded.**

      Without explanation, SLA objected across the board to Microsoft's request for deposition testimony and documents related directly to the central issue in this case: BioReference's use of Microsoft software.  *See* Ex. C.  SLA has provided no justification for its assertion that all documents and deposition testimony on this subject are subject to work product protection—nor could it, for the same reasons as set forth above.  SLA provided technical software advice to

**COVINGTON**

The Honorable Joseph A. Dickson
September 11, 2017
Page 10

BioReference in connection with a contractual audit. ██████████
██████████████████████████████████████████ *See* Ex. B. There is thus
no reason why SLA's work for BioReference would be protectable work product.

*   *   *

      BioReference is inappropriately withholding hundreds of documents that speak to the heart of this dispute on unfounded work product grounds. These documents were created not in connection with actual or even potential litigation, but instead in connection with business negotiations. Similarly, BioReference is blocking Microsoft from deposing representatives from SLA, witnesses with key knowledge regarding BioReference's licensing position and efforts to obstruct the contractual audit process. This discovery is highly relevant and does not qualify as protected work product. Accordingly, this Court should order BioReference to produce all emails and attachments that it is currently withholding solely on work product grounds. The Court should also order SLA to produce documents and a witness for deposition in response to Microsoft's subpoena.

Respectfully submitted,

*/s/ Jeffrey M. Davidson* By LCB

Jeffrey M. Davidson